**MENDES JUNIOR INTERNATIONAL COMPANY, Plaintiff,**

v.

**The M/V SOKAI MARU and Atlanta Maritime Corporation, Defendants.**

Civ. A. No. H–82–847.

United States District Court,
S.D. Texas,
Houston Division.

March 8, 1991.

William C. Bullard, Houston, Tex., for plaintiff.

James J. Sentner, Jr., Houston, Tex., for defendants.

## MEMORANDUM OPINION

FRANCES H. STACY, United States Magistrate Judge.

This litigation arises out of a maritime contract for the carriage of goods to Iraq. The shipper, a Brazilian construction company, sued the Houston-based maritime carrier for damages suffered because of delivery delays, claiming that the ship carrying its cargo deviated from the course of the contracted voyage and that the carrier was negligent in chartering a ship that appeared on the Arab blacklist.

The carrier argued that the case was time-barred under the Carriage of Goods by Sea Act's one-year statute of limitations and countered with claims of its own for damages stemming from shipper-caused delays on six voyages, for interest owed on late payments of freight and bank transfer fees, and for deadfreight charges incurred on the JADE III voyage.

The case was tried and argued before Judge Ross N. Sterling, and taken under advisement, in June, 1985. In February, 1987, Judge Sterling passed away without having issued an opinion in the case. With the consent of the parties and pursuant to 28 U.S.C. § 636(c), U.S. Magistrate Judge Frances H. Stacy reheard final arguments on November 26, 1990, and reviewed the evidence, transcript and briefs in the case.

### I. Background

On October 1, 1978, Mendes Junior International Company (MJIC) of Brazil and the government of Iraq signed a construction contract representing a four-year, $1.2 billion project to build the Baghdad–Hasaibah and Al Qaim–Akashat Railway in Iraq. Atlanta Maritime Corporation (AMC) was one of the shipping companies engaged by MJIC to carry construction materials, equipment and supplies from Brazil and other locations to Iraq.

In early 1980, while the construction project and the attendant cargo shipments were underway, war broke out between Iraq and Iran. Hostilities closed the Iraqi port of Basra to shipping and compelled MJIC to direct its materiel through the already-congested alternative ports of Aqaba, Jordan, and Kuwait City, Kuwait, for overland transport to the jobsite in Iraq.

The delays which resulted affected the construction schedule, causing Iraq and MJIC to modify their original agreement in order for the project to continue. While AMC and MJIC demonstrated some flexibility in their dealings so that shipping might proceed, each eventually developed claims against the other which, initially, they sought to resolve amicably.

When the railway project was completed, MJIC's efforts to negotiate final payment with the Government of Iraq failed. It required diplomatic negotiations between the Brazilian and Iraqi governments to resolve the matter, with MJIC recovering only a part of its claim. MJIC thereafter abandoned its negotiations with AMC for settling the claims in dispute here and filed this lawsuit.

## II. MJIC's Claim: The M/V SOKAI MARU

On November 19, 1980, MJIC contracted with AMC to transport equipment and supplies on the M/V SOKAI MARU from Brazil to Aqaba, Jordan. The ship left Santos, Brazil on December 12, 1980, to encounter a series of unforeseen circumstances and misadventures that would finally take the last of the Mendes cargo to Kuwait for discharge in March, 1981, and lead to the filing of this lawsuit on March 24, 1982.

At the threshold we must consider whether March 24, 1982 is, as AMC claims, beyond the deadline for bringing this suit.

### AMC's Statute of Limitations Claim

■ Section 3(6) of the Carriage of Goods by Sea Act (COGSA), 46 U.S.C.App. § 1303(6) (1976), contains a one-year statute of limitations that begins to run when the goods at issue are delivered to the shipper or his agent.

The SOKAI MARU arrived in Kuwait on March 15, 1981, discharged cargo including that of MJIC, and departed on March 26, 1981. This lawsuit was filed on March 24, 1982. In order for the lawsuit to proceed, the last of the MJIC cargo aboard the SOKAI MARU must have been discharged after March 24, 1981. The exact date of the Kuwait unloading, however, is in dispute.

AMC claims that MJIC's cargo aboard the SOKAI MARU was unloaded on March 15, 1981, the day the ship obtained a berth in Kuwait. In support of its position, AMC presented documents at trial, issued by the Kuwaiti port authority and attested to by the U.S. Embassy and the Ministry of Foreign Affairs, showing that MJIC's goods were unloaded from the SOKAI MARU on March 15, 1981. Twelve packages from this shipment were warehoused at the port car division from the time they were unloaded until MJIC picked them up on April 4th and 6th, and the documents related to the warehousing also show a discharge date of March 15, 1981. At trial, AMC's agent in Kuwait verified that the MJIC goods were unloaded and delivered on March 15.

■ Under the COGSA statute, delivery occurs when the goods leave the ship's slings, whether to the consignee or his authorized agent. *C. Tennant Sons & Co. v. Norddeutscher Lloyd*, 220 F.Supp. 448 (E.D.La.1963). According to AMC's argument, both lots having left the ship's unloading facilities on March 15, both lots were "delivered" on March 15 and this lawsuit is barred.

MJIC disagrees with this account, speculating that the port authority, in preparing the documents it provided to AMC, simply assumed that unloading occurred on the day listed as the date of arrival. MJIC claims that its cargo was not unloaded until March 26, 1981, the day the SOKAI MARU departed Kuwait. Under those facts, this lawsuit could proceed.

In support of its position, MJIC relies on a letter written on July 10, 1981, by John G. Miller, who replaced Mr. John Wulfers as AMC manager in the early months of

1981 after the relevant events had taken place. In this letter, Mr. Miller states that the "vessel finished discharging in Kuwait and sailed on March 26, 1981." Several MJIC employees also testified that the vessel was unloaded on the 26th, basing their belief on documents which show that the vessel "discharged and left on the 26th."

The single discordant note in plaintiff's litany is a statement by Mr. Delzio Morato, managing director of MJIC's trading company, Comex, which handled its shipping of goods and supplies to Iraq. In answer to a question posed to him by written interrogatory, he states that the SOKAI MARU finished unloading MJIC's goods in Kuwait on March 23, 1981. If correct, this delivery date would also bar this lawsuit. Under cross-examination at trial, however, Mr. Morato attributed that answer to a "typo," and added his voice to those of the other employees who said delivery occurred on the 26th. Whatever the case, nowhere in this evidence is there any definite statement, standing alone, or any testimony based on direct personal knowledge, that MJIC's cargo was unloaded on the 26th of March, 1981.

After weighing the evidence and testimony concerning this single question of fact on which the issue depends, the Court concludes that the SOKAI MARU indeed sailed from Kuwait on March 26, 1981, but the MJIC cargo was unloaded from it on March 15, as evidenced by verified port documents. It bases its conclusion on the port documents, the only concrete evidence presented, and notes the absence of any evidence of similar authority in opposition or of any convincing testimony to the contrary. The result is that under the facts of this case, this lawsuit is barred.

MJIC, however, argues that maritime law ousts the statute of limitations defense where there has been an unreasonable deviation and, presuming that the facts of this case support the finding of an unreasonable deviation, voids the statute of limitations here. We need not decide whether an unreasonable deviation does indeed have this effect, an issue on which the courts disagree, because we find that the SOKAI MARU did not at any time in its voyage deviate unreasonably.

### Deviation

 MJIC claims that the SOKAI MARU deviated on two separate occasions during its voyage from Brazil before MJIC's goods were finally delivered. The first of these involved a side trip to unload cargo in Jeddah while the ship waited on line for a berth at congested Aqaba. The second involved the ship's return from Jeddah to Aqaba to unload non-MJIC Jordan-bound cargo after MJIC had agreed to send its cargo to Kuwait so as to avoid the Aqaba congestion.

The facts are these: The SOKAI MARU, carrying cargo destined for Aqaba, Jeddah, Damman and Kuwait, left Brazil on December 12, 1980. The bill of lading listed Aqaba as the port of discharge. MJIC, operating under contractual time constraints, expected that AMC would unload its equipment in Aqaba first, although the shipping contract contained no terms to that effect.

When the SOKAI MARU arrived in Aqaba, congestion necessitated a minimum four-week wait for a berth. Her captain elected to register the ship with Aqaba port authorities, a procedure described as analogous to taking a number at a bakery, and make the two-day voyage to Jeddah, Saudi Arabia to unload non-MJIC cargo. He expected that the ship would resume her place on line upon her return to Aqaba having utilized otherwise lost time, a procedure successfully followed by the AMC–MJIC carrier M/V ST. CHRISTOPHORUS on an earlier date.

After the SOKAI MARU had negotiated entrance through the barrier reef into the sheltered port of Jeddah on January 1, 1981, the Saudi Arabian government declared the ship on the Arab blacklist for having traded with Israel, and refused her a berth or a pilot to aid her departure. AMC and Sanko Kisen, the charterer, were unaware of the ship's adverse history, there being no notation of restrictions against calling at Saudi Arabia, or Arab countries generally, on her charters.

Meanwhile, at a meeting in Belo Horizante, Brazil on January 8, 1981, AMC and

MJIC agreed that, upon the release of the SOKAI MARU in Jeddah, MJIC's goods would be taken to Kuwait for discharge rather than to congested Aqaba. Overlooking the fact that the ship carried non-MJIC, Jordan-bound cargo which had to be unloaded in Aqaba, MJIC expected that she would sail directly from Jeddah to Kuwait. Instead, when Kasmatsui Kaiun, the shipowner, was able to secure the SOKAI MARU's release on February 12, she returned to Aqaba to unload this other cargo. MJIC characterizes this return to Aqaba as a second deviation.

The Supreme Court has defined deviation as " 'a voluntary departure, without necessity or reasonable cause, from the regular and usual course' of the voyage...." *Hostetter v. Park*, 137 U.S. 30 at 40, 11 S.Ct. 1 at 4, 34 L.Ed. 568 at 572 (1890). What constitutes the "regular and usual course" of a particular voyage may be found both in the express contract and in the usage and custom of the trade or carrier. *American Cyanamid Co. v. Booth S.S. Co.*, 99 F.Supp. 232 at 235, 1951 A.M.C. 1505 at 1511 (S.D.N.Y.1951), *aff'd* 195 F.2d 529 (2d Cir.1952); *Haroco Co. v. The Tai Shan*, 111 F.Supp. 638, 641 (S.D.N.Y.1953). In deciding whether or not a deviation is reasonable, the courts have considered the surrounding circumstances:

> The true test seems to be what departure from the contract voyage might a prudent person controlling the voyage at the time make and maintain, having in mind all the relevant circumstances existing at the time, including terms of the contract and the interests of all parties concerned....

*American Cyanamid* at 237. *See also Surrendra v. S.S. Hellenic Hero*, 213 F.Supp. 97, 1963 A.M.C. 1217, 1223 (S.D.N.Y.1963).

MJIC's contract for the SOKAI MARU was evidenced by a "Conlinebooking" Liner Booking Note and a Bill of Lading listing Aqaba as the port of discharge. Both of these documents contained the following defensive clauses:

> 5. ... the intended voyage shall not be limited to the direct route but shall be deemed to include any proceeding or returning to or stopping or slowing down at or off any ports or places for any reasonable purpose connected with the service....
>
> 6. Whether expressly arranged beforehand or otherwise, the Carrier shall be at liberty to carry the goods to their port of destination ... proceeding either directly or indirectly to such port and to carry the goods ... beyond their port of destination....

The bill of lading defines the scope of a voyage. It is the contract between the parties, defining rights, duties, exemptions and limitations either imposed by statute or mutually agreed upon. *The Caledonia*, 157 U.S. 124 at 139, 15 S.Ct. 537, 39 L.Ed. 644 (1894); *Jones v. The Flying Clipper*, 116 F.Supp. 386 at 388 (S.D.N.Y.1953).

The bill of lading for the SOKAI MARU listed Aqaba as the port of discharge. It also provided that the voyage need not be limited to the direct route but might be altered for any reasonable purpose connected with the service. This was the scope of the SOKAI MARU voyage.

The SOKAI MARU sailed to Aqaba, the port of discharge, without deviating. It then voluntarily went to Jeddah to make effective use of waiting time required at the designated port. It did not sail to Jeddah to load new cargo or to otherwise enhance profits, but rather to unload cargo it was already carrying, cargo which had to be discharged in Jeddah at some time in any event. This cannot be classified as a voluntary deviation without reasonable cause, nor is it a voyage outside of the scope of a contract which specifically provides that the vessel is at liberty to change its course "for any reasonable purpose connected with the service." The actual itinerary of the SOKAI MARU was reasonable and of a type within the contemplation of the parties to the contract of carriage.

Courts have insisted that "liberty clauses" be read narrowly, cutting them down "to what is fairly applicable to the voyage which has been agreed upon and defined," and limiting them "to ports substantially on the course of the voyage." *American*

*Cyanamid* at 236. Jeddah was but a two-day voyage distant. It was a port on its regular itinerary to which the SOKAI MARU was carrying goods for another shipper. A narrow reading of the liberties clauses gives defendant all the defense it needs. We find that the trip to Jeddah did not constitute a deviation.

MJIC maintains that AMC intended from the outset to go to Jeddah before Aqaba, contrary to the contracted voyage. As proof, it offers the stowage plan of the SOKAI MARU to show that Jeddah cargo was loaded at the top of the storage compartments for early removal, and that AMC already intended to deviate at the time it left Brazil.

After examining the evidence and testimony on this issue of fact, we are convinced that stowage was such that either the Aqaba cargo or the Jeddah cargo could have been unloaded first. The M/V SAINT CHRISTOPHORUS, on an earlier AMC–MJIC voyage, had utilized a delay in congested Aqaba to unload Jeddah cargo without incident or complaint. With this precedent in mind, it is possible that AMC loaded the SOKAI MARU so that either Aqaba or Jeddah cargo could be unloaded first, depending on conditions. It is not the case that stowage definitively indicates a plan to unload first in Jeddah.

Even if the trip to Jeddah were deemed a deviation, however, it would be a reasonable deviation, considered from the point of view of "a prudent person controlling the voyage ... having in mind all the relevant circumstances existing at the time, including terms of the contract and the interests of all parties concerned...." *American Cyanamid* at 237. In light of the anticipated delay in Aqaba, the presence on board of Jeddah cargo which required delivery, the liberty clauses in the bill of lading, and the previous experience with the SAINT CHRISTOPHORUS, the deviation was reasonable, such as a prudent person might make.

The return to Aqaba from Jeddah before continuing on to Kuwait is alleged to be the second deviation. Among the cargo aboard the SOKAI MARU was non-MJIC, Jordan-bound cargo. Unlike the MJIC cargo going to Iraq, this other cargo was to remain in Jordan. Thus, it enjoyed priority status and did not have to wait on line to unload. MJIC's agreement to have its own cargo carried on to Kuwait did not dispose of the necessity of unloading this other priority cargo in Aqaba at some time. Nor can MJIC claim surprise at the presence of these other goods on the ship because its own agent in Brazil had booked them for delivery to Aqaba.

The return to Aqaba was part of the ship's itinerary, well within the confines of the shipping contract between the parties. This departure from the original course of the voyage, while indeed voluntary, was not without reasonable cause, and was not a deviation under the Supreme Court's *Hostetter* definition.

MJIC raises the argument that Section 4(4) of the Carriage of Goods by Sea Act (COGSA) characterizes any deviation from the prescribed route for the purpose of loading or unloading goods as prima facie unreasonable.

> ... any reasonable deviation shall not be deemed to be an infringement or breach of ... the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom: *Provided, however*, That if the deviation is for the purpose of loading or unloading cargo ... it shall, prima facie, be regarded as unreasonable.

46 U.S.C.App. § 1304(4) (1976). Both the trip to Jeddah and the return to Aqaba, they point out, were for the purpose of unloading goods, and were therefore unreasonable deviations.

The language of the COGSA statute is clear in that it has effect only in the event that a deviation is found. We have found none, and MJIC's argument fails. Even had there been a deviation, AMC has met its burden of proving that it was reasonable, under the facts of this case, to follow the course they chose to take, overcoming any presumption of unreasonableness under the statute.

We find that plaintiff cannot avoid the one-year time limitation provided by COG-

SA. The suit was not brought before the applicable deadline. It is therefore statutorily barred and plaintiff should take nothing.

In the event this decision is determined on appeal to be erroneous and this suit is not barred, we alternatively address the original question, whether AMC is liable to MJIC for damages suffered because of delay in the delivery of cargo.

### MJIC's Claim for Damages Due to Delay

MJIC brought this suit against AMC to recover damages suffered due to delay in the delivery of cargo it shipped to the Middle East aboard the SOKAI MARU, claiming that the ship deviated unreasonably from the course of the voyage for which it had contracted, that AMC was negligent in chartering for this voyage a ship that appeared on the Arab blacklist, that the use of such a ship was contrary to notations on its bill of lading, and that the delivery delay in Kuwait was caused by AMC's failure to have the ship's manifest in proper form.

■ As a matter of maritime law, if a ship deviates unreasonably from its bill of lading, it breaches the contract of carriage and invalidates the contractual defenses to liability contained therein. *See Spartus Corp. v. S.S. Yafo*, 590 F.2d 1310 (5th Cir.1979). This was the general rule at the time this case was tried and remains the law today, elsewhere and in the Fifth Circuit. *Vistar, S.A. v. M/V Sea Land Express*, 792 F.2d 469, 472 (5th Cir.1986); *Gen. Elec. Co. Int'l Sales Div. v. S.S. Nancy Lykes*, 706 F.2d 80, 86 (2d Cir.1983), *cert. denied*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1984); *Ataei v. M/V Barber Tonsberg*, 639 F.Supp. 993 at 999 (S.D.N.Y. 1986). It is important to MJIC's claim for delay that it prevail on the deviation issue, for if the SOKAI MARU deviated unreasonably, all defensive clauses in the bill of lading would be ousted and have no effect. This includes clause 13, "The Carrier shall not be responsible for any loss sustained by the Merchant through delay of the goods unless caused by the Carrier's personal gross negligence."

We have previously decided that the SOKAI MARU did not deviate as that term is defined under maritime law. The defensive language in the contract, including clause 13, remains intact but requires us to consider whether the delay in delivery was caused by AMC's gross negligence.

MJIC charges that AMC was negligent, first, in providing a ship that was on the Arab blacklist, and sailing her to Jeddah where she was detained and delayed, and second, in creating delay in Kuwait through failure to properly and timely prepare documents required to discharge the cargo.

The facts concerning the Arab blacklist are these: Both the time charter party between Kasamatsu Kaiun K.K. of Japan, the owner of the SOKAI MARU, and Sanko, the time-charterer of the ship, and the charter party between Sanko and AMC, the sub-time-charterer of the ship, provided for trading world-wide, "excluding Cuba, Israel, North– and South–Vietnam, North Korea, Cambodia, Japan, communist and communist-controlled countries, Great Lakes, Lebanon, Iran, Iraq, Syria, Egypt." It also provided that "[t]he vessel is eligible to enter the port(s) of countries not excluded by this charter party in conformity with those countries' laws and regulations."

There was nothing in the charters to notify either AMC or Sanko Kisen, the first charterer, that the SOKAI MARU could not go to Saudi Arabia or to Arab countries as a group. Yet, when the SOKAI MARU arrived in Jeddah, she was detained for being on the Arab blacklist. It required intervention on the part of the Japanese owners to resolve the problem and obtain her release.

Witnesses for both parties with knowledge of the shipping industry testified that it is reasonable and customary within the trade to rely on a reputable charterer's specifications of where his ship can or cannot go. A shipowner or charterer may restrict his charter as he wishes—to prevent competition, to avoid difficulties and dangers, or for any other reason—and need not explain. The chartering party does not

in usual practice question the charterer's stipulations.

■ In reliance on the charter, AMC believed it could safely sail the SOKAI MARU to Arab countries including Saudi Arabia, but not to Lebanon, Iran, Iraq, Syria, or Egypt for reasons which were private to the ship's owners. AMC expected to sail, and did sail, to Jordan, Saudi Arabia and Kuwait, none of which were included on the charter's list of exceptions. AMC reasonably relied on the charter of a reputable charterer, as was customary within the trade, concerning the absence of certain geographical limitations. It was justified in doing so and had no duty to inquire further. We conclude that AMC was not grossly negligent in chartering the SOKAI MARU and sailing her to Saudi Arabia.

It is true that the detention in Jeddah caused delay in the ultimate delivery of MJIC's cargo, but it is not necessarily true that the voyage to Jeddah caused that delay. If the ship was on the Arab blacklist, she was blacklisted throughout the Arab world and not in Saudi Arabia alone. Jordan might well have detained her upon processing her papers, had she remained on line in Aqaba, and the same could have happened in any other Arab country. We discuss this possibility merely to illustrate that it was not the voyage to Jeddah in particular that caused the delay, but rather the fact that the SOKAI MARU was, unbeknownst to AMC, on the Arab blacklist.

■ In connection with the blacklist, MJIC also charges that AMC breached the contract of carriage when the SOKAI MARU was detained. It bases its argument on the fact that the legend, "This vessel is not scheduled to call at any Israeli port and is not included in the Iraq government blacklist," or words substantially similar, appeared on the SOKAI MARU bill of lading. Indeed, at MJIC's request and because MJIC's construction contract with Iraq required it, AMC typed these words on the front page of each bill related to this case.

It is MJIC's contention that this legend, once entered on the document, became part of the bill of lading, constituting a kind of warranty binding AMC. The argument relies on the belief that the Iraq government blacklist and the Arab blacklist are one and the same. Because of the warranty, AMC had a duty to investigate the SOKAI MARU's history, MJIC claims, and its failure to do so constituted negligence and made it responsible for the delay that occurred as a result of the ship's detention.

AMC argues that it was not bound by the legend on the bill of lading. These were not bargained-for terms, but were put there at MJIC's request only so that MJIC would be in compliance with, and could collect on, its Iraqi contract. We agree.

■ Where differences in contract interpretation arise, the meaning each party attaches at the time the contract was made prevails. Here it appears that the parties applied language onto the face of the contract document for reasons apart from the agreement itself, without considering its possible future impact. In such a situation, the language has no mutually agreed-upon meaning at all.

The contract formulated by the parties and contained in the SOKAI MARU bill of lading and the booking note incorporates many agreed-upon conditions. Those that are not contained in the "full terms" of the form contract are set forth and numbered in attached addenda. The language of the disputed legend appears nowhere in the "full terms" nor in the addenda. The parties could have put it there alongside the other negotiated terms but chose not to do so. Instead, they typed the legend on the front of the document where it would be clearly seen by third parties, lending force to AMC's claim that it was placed there for reasons extraneous to the contract. The legend was more in the nature of an incidental addition to the contract than a bargained-for warranty.

There is no evidence to show that the legend contained bargained-for terms. Indeed, it seems unlikely that a reasonable carrier would assume unconditional liability of this sort in light of the many defenses he ordinarily bargains for in standard con-

tracts of carriage. It is unlikely the carrier would warrant statements, supplied by a charterer, which, in the custom of the trade, the charterer did not ordinarily expect to have to either justify or explain. We are convinced that these terms were not intended to constitute part of the contract, and did not bind the parties.

Even if they did so, we find no evidence to support the theory that the Iraq government blacklist and the Arab blacklist are one and the same. The Iraqi government required assurances that ships used in the railway project would not be on the "Iraq government blacklist," suggesting that they had a list of their own apart from the more general Arab blacklist. Nor is there any evidence that the SOKAI MARU was on the Iraq blacklist, or that she was detained because she was on the Iraq blacklist, in violation of the legend. The evidence suggests only that she was on the Arab blacklist.

We conclude that the notation on the bills of lading, that the ship was "not included in the Iraq government blacklist," was not violated by the event of the SOKAI MARU's detention, nor was the detention a result of negligence on the part of AMC.

■ In order to consider the claim that AMC caused delay in Kuwait through its failure to prepare certain documents, we must return to events that occurred in Jordan. When the SOKAI MARU returned to Aqaba following the Jeddah detention, thirteen MJIC trucks were unloaded from the ship to access the local Jordan cargo to be discharged. MJIC representatives saw an opportunity to take possession of the vehicles, and drove them away for immediate transshipment even though AMC objected that partial unloading would necessitate new customs documents and cause discharge problems in Kuwait.

Once in Kuwait, the SOKAI MARU waited from February 23 until March 15 to berth because papers were not in order. Customs formalities and the preparation of documents necessary for clearing cargo are ordinarily handled by the shipper or an agent hired for this purpose, but MJIC was unable to make the required arrangements because the ship's manifest had not been corrected to reflect the thirteen trucks unloaded in Aqaba.

There is no indication that it is the duty of the carrier under these circumstances to adjust a ship's incorrect manifest. AMC's agent in Kuwait testified under oath that the information necessary to correct the manifest had to come from the shipper. Indeed, AMC testified that it would be improper for the carrier to alter a manifest.

Where MJIC chose to unload trucks in Aqaba, was warned of the potential problems it might cause, was itself responsible for customs clearance, failed to take necessary measures to affect timely customs clearance, and can show no affirmative duty on the part of AMC to adjust the manifest, MJIC cannot recover damages for any delay that resulted.

There is yet another reason why AMC cannot recover on its claims. It has failed to prove its damages.

■ After MJIC filed this lawsuit, it hired a financial consultant from within its company to calculate damages due to the delay of the SOKAI MARU. This consultant, through a long series of calculations based on conjectural figures, concluded that the 50–day delay in unloading cargo translated to a three-day delay in the final completion of the railway construction project. In the same manner, he then determined that damages for this three-day delay equaled $2,038,508.43.

The Court finds the evidence of these damages inconclusive and unconvincing. The translation of the delay of equipment delivery into an ultimate delay of three days in project completion relies on methods and figures that are hypothetical, intangible, and speculative at best. Construction was not halted because of the delayed equipment; workers were not terminated; progress continued to be made on the project. From the evidence presented by MJIC, it is impossible to tell if, or to what extent, there was any delay at all. The calculations presented are based on strictly hypothetical figures. The Court

cannot base a finding of damages on such evidence. MJIC has failed to meet its burden in this regard, and has not proved in what amount, if any, it was damaged.

### III. AMC's Counterclaims

Judgment on AMC's counterclaims is rendered as follows, in accordance with Federal Rule of Civil Procedure Rule 54's mandate to grant to each party the relief to which he is entitled.

### The M/V SOKAI MARU

 AMC asks damages for the SOKAI MARU's loss of hire, the cost of each day's fuel, and war risk insurance during the 16 days, 22 hours and 25 minutes the ship was delayed in Kuwait between February 3 and March 12, 1981. The delay occurred as a result of customs documents not being in order, so that the ship could not obtain a berth and unload on schedule. Matters of customs clearance are the responsibility of the shipper, and were regularly taken care of by MJIC's agents in each port of entry.

We previously denied MJIC's claim against AMC for this same delay, finding that AMC had no role in, nor was responsible for, preparing clearance documents. We also noted that responsibility for obtaining customs clearance falls to MJIC, the shipper. The Kuwait delay occurred as a result of MJIC's failure to secure the clearance. We therefore find that AMC recovers damages in the amount of $194,456 from MJIC for loss of hire, fuel and war risk insurance during the Kuwait delay.

### The M/V JADE III

 In November, 1981, MJIC contracted with AMC to ship 6,902.801 cbm tons of cargo aboard the M/V JADE III. Although the vessel delayed three days awaiting the cargo, only 3,706.601 cbm tons were ultimately delivered and loaded, leaving the ship short-freighted by 3,196.2 cbm tons.

The contract of carriage specifies that (t)he Merchant or his Assign shall tender the goods when the vessel is ready to load and as fast as the vessel can receive.... Otherwise the Carrier shall be relieved of any obligation to load such cargo and the vessel may leave the port without further notice and deadfreight is to be paid.

Thus, the carrier may collect at the agreed rate for the amount of tonnage originally contracted. The contract also provides that "The Merchant shall bear all overtime charges in connection with tendering ...," so that the shipper is responsible for covering costs resulting from his delayed delivery. AMC accordingly claims total damages of $273,171, $17,000 of which stems from the three-day wait for cargo.

MJIC does not deny short shipment or AMC's right to payment for it, but claims that it satisfied this debt by contracting another shipment on the M/V SILVER BAY. In support, it offered testimony of Terry Melgaco, an AMC booking agent in Brazil who, after originally testifying under oath that no definite agreement to settle the JADE III claim in the SILVER BAY had ever existed, later altered her testimony to claim that she, personally, had settled the JADE III claim by booking a shipment on the SILVER BAY.

The Court gives no credence to this testimony. Ms. Melgaco herself testified that she lacked authority to make final booking decisions, telexing all bookings to the main office for final, written authorization. Further, Ms. Melgaco acknowledged under oath that she never transmitted her SILVER BAY agreement to John Wulfers, her superior in the main office. Mr. Wulfers testified that he had no knowledge of such a settlement, had never issued authorization for such a settlement, and confirmed that Ms. Melgaco was not authorized to do so on her own.

Several witnesses described conversations in which vague references were made to "settling the JADE III claim in future commercial relations," or words to that effect. Ms. Melgaco may have been led to make the unwarranted assumption that the SILVER BAY, being the shipment immediately after the JADE III, constituted settlement. However, The SILVER BAY marked the end of AMC's shipping relation-

ship with MJIC and cannot be said to evidence continuing business relations. Furthermore, an offer to ship cargo at ordinary rates, and nothing more, as settlement for dropping a large monetary claim makes no economic sense for the carrier.

We are not convinced that there was ever an agreement to settle the JADE III claim in the SILVER BAY, specifically. Under the terms of its contract for shipment of 6,902.801 cbm tons and responsibility for loading delays, MJIC owes AMC the $273,171 claimed.

### The M/V BENSTAC

■ Among the cargo shipped to Kuwait aboard the BENSTAC was a large quantity of beer in transit to Iraq. In order for beer to be off-loaded in Kuwait, which ordinarily prohibits the importation of alcoholic beverages, documents must be prepared and advance arrangements made to assure its eventual transshipment out of the country. MJIC was responsible for these and all customs arrangements, both by contract and by practice within the trade.

The BENSTAC arrived on April 7, 1981, but, lacking documents to clear the beer, was not allowed to berth. On May 3, permission was finally granted for discharge of only the non-alcoholic portion of the cargo. Having unloaded the unrestricted cargo, the BENSTAC left Kuwait with the beer still on board.

Ultimately, AMC carried the alcoholic cargo to Sharjah, United Arab Emirates, where it was discharged and stored. It now claims payment of $12,184.59 for the carriage to Sharjah and $157,187.50 for the delay suffered in Kuwait.

The shipping contract for the BENSTAC, like that for each of the voyages with which we are here concerned, contains the following provisions:

11(d) The Merchant shall be liable for all fines and/or losses which the Carrier ... may incur through non-observance of Custom House and/or import or export regulations.

16(c) Should it appear that ... difficulties in ... loading or discharging would prevent the vessel from leaving the port of loading ... safely and without delay, the Master may discharge the cargo at port of loading or any other safe and convenient port.

(d) ... If in connection with the exercise of any liberty under this clause any extra expenses are incurred, they shall be paid by the Merchant in addition to the freight ... and a reasonable compensation for any extra services rendered to the goods.

By trade custom and contract, AMC had a right to expect that MJIC would make proper arrangements to receive the beer in Kuwait. MJIC was carrying on a large project in the Arab world and could not have been unaware that beer was restricted there. It knew that all customs arrangements, and any special clearances required for particular cargo, were its responsibility. Because MJIC failed to secure the necessary permits so that the beer could be unloaded, AMC was free to take the beer to another port.

MJIC must comply with the contract. It must reimburse AMC for the cost of carrying the goods on to Sharjah as well as for the delay caused, in a total amount of $169,372.09.

### AMC's Detention Claims

Four vessels carrying MJIC cargo to the Middle East experienced severe, unexpected delays because of port conditions. The contract of carriage for each, like that of the other voyages at issue in this case, specified full liner terms whereby the cost and obligation of loading are borne by the carrier. Because of the full liner terms, there was no provision for demurrage, which means the shipper is not fined for delays in loading unless he is their cause. Under such terms, time lost because of delays in obtaining a berth or unloading are normally for the carrier's account.

Although the carrier charges a higher rate for assuming the risk of full liner terms, the risk is not without limit. Clause 16 of the bills of lading and booking notes which govern the voyages in question con-

tains terms, previously quoted in this opinion at pages 23 and 24, which authorize the ship to unload its cargo in the port where it is loading or unloading, or in any other safe and convenient port, if difficulties prevent or delay the vessel's safe departure. It may then charge the shipper for the extra expenses incurred in doing so and/or for any services rendered in regard to the goods.

In light of this contractual option, AMC tried to negotiate an oral agreement whereby each shipper would pay its proportionate share of the ship's maintenance during any qualifying delay longer than the allowed discharge time for the cargo plus a grace period of fifteen days. In exchange, AMC would refrain from exercising its option to unload elsewhere. At the time this lawsuit was filed, AMC claimed to have secured such an agreement from MJIC. Each of the four following claims is based on this scenario.

### The M/V CARDIFF CITY

On January 2, 1980, before the war closed Iraqi ports, the CARDIFF CITY arrived in Basrah. Due to port congestion, it could not discharge immediately. While the ship waited, the draft in the river decreased dramatically so that unloading became impossible. It was not until May 3 that the vessel was provided a berth so she could unload.

AMC informed MJIC, and the shippers of other cargo it was carrying, of the delays it was experiencing and of its intention to bill each shipper for his share of maintaining the ship while she waited or, alternatively, to unload elsewhere. For MJIC, this constituted a sum of $136,120.22.

Whether or not MJIC at any time agreed to pay is disputed. At one time MJIC, alone among the various shippers, told AMC to unload elsewhere if it wished, but insisted that AMC then cover the cost of the transport of its cargo to Iraq. That position suggests reliance on clause 6 of the shipping contract which, in contrast to clause 16, provides that

the Carrier shall be at liberty to carry the goods to their port of destination ... proceeding either directly or indirectly to

such port and to carry the goods or part of them beyond their port of destination, and to tranship, land and store the goods either on shore or afloat and reship and forward the same at Carrier's expense....

Such reliance, premised on the theory that the CARDIFF CITY was exercising liberty in the scope of her voyage, is inappropriate where, as here, unloading difficulties cause delay and trigger clause 16, which makes the shipper liable for extra shipping expenses incurred.

AMC refused to accept such a condition, and eventually discharge of the cargo was arranged in the military area of the port of Basrah. The goods were not carried elsewhere, and MJIC did not pay.

■ After considering the evidence before us, we conclude that there was no agreement to pay detention in exchange for the M/V CARDIFF CITY's remaining in Basrah. AMC, having chosen not to exercise its contractual option to unload elsewhere, remains bound by the full liner terms of its contract and must pay for delay encountered on this voyage.

### The M/V CAPTAIN YEMELOS, The M/V FUNING, and The M/V SAINT CHRISTOPHORUS

The claims in regard to the M/V CAPTAIN YEMELOS, the FUNING, and the SAINT CHRISTOPHORUS originated because of the dramatic increase in port congestion in late 1980 after the onset of the Iran–Iraq war. Ships arriving at affected ports were faced with extraordinary unloading delays extending into weeks and months.

Both parties were required to allocate the attendant risks in some way if business was to continue under the circumstances. AMC had a contractual right to simply unload any cargo it was carrying in another port when it encountered these situations. Instead, it offered to wait out the delays and unload in the contractually-designated ports if the shippers would, meanwhile, contribute proportionately to the maintenance of its ships, payment to begin

after the allowed discharge time for the cargo plus fifteen days. It was economically advantageous to MJIC to ignore clause 16 of the contract and simply insist on full liner terms, but efficient delivery of its cargo was also important.

Evidence that MJIC agreed to contribute its share toward the vessels' detention is found in a series of telexes between AMC and shipping agents as well as in the testimony of employees of both parties. The clearest documentation is found in regard to the CAPTAIN YEMELOS, where telexes from the agents advising "MJIC agrees to detention" are followed with telexed orders to "cancel sailing instructions for the YEMELOS."

Significantly, both Mr. Wulfers of AMC and Mr. Morato of Comex testified that they personally agreed at a meeting in Brazil in January, 1981, on detention beyond a 15–day grace period in regard to all three ships. A follow-up letter from Wulfers to Morato shortly afterward seems to summarize the terms. It is a fact that in all three cases AMC waited out the delays and did not unload elsewhere. MJIC, however, has never paid.

MJIC now claims that its intention to pay "proportionately" was always contingent on actual payment by the other shippers and/or settlement of its own claim for the delay of the SOKAI MARU. There is no documentation to support these claims. The theories surface in testimony generated during this lawsuit rather than in documents created at the time of the events. While telexes from AMC to the shipping agents inquire whether other shippers have paid or have agreed to do so, we are not convinced that this constitutes anything more than simple inquiry about the progress on detention payments in general. We cannot find credible evidence to suggest that proportionate payment by MJIC was ever contingent upon the payments of others. For the same reasons, we are not convinced that detention payments were contingent upon settlement of MJIC's SOKAI MARU claims.

■ We conclude that there was an oral agreement, not contingent upon payment by other shippers or upon settlement of any other claims, whereby MJIC would pay its proportionate share of the maintenance of the M/V/ CAPTAIN YEMELOS, the M/V SAINT CHRISTOPHORUS, and the M/V FUNING during delays beyond allowed discharge time plus fifteen days, in return for which AMC waived its option to discharge in another port.

The M/V CAPTAIN YEMELOS arrived in Aqaba on November 20, 1980, but could not berth for unloading until December 14, and did not complete discharge until January 6, 1981. In accordance with the invoice tendered, MJIC owes damages of $92,-712.01 to AMC as its portion of the delay. The M/V FUNING arrived in Aqaba on November 10, but could not berth until November 25, 1980, and unloading was not completed until December 4. Accordingly, MJIC owes AMC $11,689.57 for its proportionate share of the delay. The M/V SAINT CHRISTOPHORUS arrived and registered in Aqaba on December 12, 1980, but, learning of port congestion, went on to Jeddah to discharge Jeddah-bound cargo. After returning to Aqaba on December 18, the vessel continued to wait for a berth until January 19, 1981, and discharge was not complete until February 9. According to the terms of its oral agreement, MJIC owes AMC $193,654.11 for the ship's delay.

*The Claim for Late Freight and Bank Charges on Letters of Credit*

MJIC has admitted liability for the payment of bank charges on letters of credit and bank transfers connected with the payment of freight charges. The parties agree that this is due in the amount of $4,880.70. MJIC will accordingly pay AMC this amount.

■ The parties further agree that interest is due on late freight payments according to the Labor rate and that AMC granted a grace period of fourteen days from the date of shipment in which MJIC might open a letter of credit to pay freight. They differ, however, on the method for calculating the amounts owed. AMC believes that interest is owed until it actually

receives its money while MJIC argues that interest is owed only until a letter of credit is opened.

In practice, MJIC opened letters of credit to pay freight all over the world, at its convenience. AMC had to wait for advice from MJIC in order to know where to collect its money. If interest were owed only until the letter of credit were opened, AMC argues, MJIC could choose to delay its payment indefinitely by delaying the information, or by imposing impossible conditions on the letters of credit, and suffer no penalty. MJIC argues, on the other hand, that if interest were owed to the time that AMC were actually paid, they could choose when to collect, and thus control the amount of interest gained. To resolve the matter, we look to the intent of the parties in formulating their agreement.

The shipping contract between the parties specified that freight would be prepaid. In order to receive U.S. dollars rather than fluctuating Brazilian currency, AMC agreed to allow MJIC a period of fourteen days in which to provide a letter of credit against which it could draw U.S. currency. We see no other purpose for this agreement except that of payment in U.S. dollars within fourteen days in lieu of prepayment. AMC was interested in getting its money and was unlikely to delay collection for interest it could as well earn elsewhere. On the other hand, MJIC could delay payment at will if it need only open the letter of credit and not inform. We find that interest on overdue freight payments is properly calculated up to the time that AMC actually receives its money. Accordingly, MJIC must pay to AMC the sum of $68,356.32.

A separate judgment will be entered in accordance with Federal Rule of Civil Procedure 58, ordering that, MJIC's claim being time-barred, Plaintiff take nothing, and AMC recover in the total amount of $1,008,291.80.